IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MEGAN O'NEIL, | ) | CASE NO. 1:19-CV-1486 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Megan O'Neil ("O'Neil") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

O'Neil filed her application for SSI on September 23, 2016, alleging a disability onset date of January 1, 1999. Tr. 13, 169-170. She alleged disability based on the following: anxiety/depression, Crohn's disease, herniated disc-chronic backpain, and ADHD-learning disability. Tr. 186. After denials by the state agency initially (Tr. 103) and on reconsideration (Tr. 118), O'Neil requested an administrative hearing (Tr. 127). A hearing was held before an Administrative Law Judge ("ALJ"), at which time O'Neil amended her alleged onset date to September 23, 2016. Tr. 13, 184. In her May 27, 2018, decision, the ALJ determined that there are jobs that exist in significant numbers in the national economy that O'Neil can perform, i.e.

1

she is not disabled. Tr. 25-26. O'Neil requested review of the ALJ's decision by the Appeals Council (Tr. 167) and, on April 26, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

O'Neil was born in 1981 and was 35 years old on her alleged onset date. Tr. 24. She has an Associate's degree. Tr. 42. She last worked in 2016 as a vendor with her son; her son would buy items at yard sales and they would resell the items online or at flea markets. Tr. 46-49, 82-83.

### B. Relevant Medical Evidence[1]

In August 2014, O'Neil saw gastroenterologist Craig Harris, M.D., complaining of loose stools, some cramps, and bleeding. Tr. 601. The treatment note states that she had been diagnosed with "Crohn's disease of the terminal ileum." Tr. 601. Upon exam, she had minimal tenderness in the right lower quadrant of her abdomen and no masses or bleeding. Tr. 601. She was taking medication, including omeprazole, Carafate Suspension, Pentasa, and Lomotil. Tr. 601. Dr. Harris ordered a follow-up colonoscopy. Tr. 601.

A colonoscopy performed in September 2014 revealed active Crohn's disease in O'Neil's terminal ileum and it was advised she continue her medications. Tr. 602-607

In April 2015, O'Neil saw Dr. Harris and his treatment note reads, "She stopped her Pentasa a month ago because she said she was constipated." Tr. 600. He remarked that O'Neil had not seen him since her colonoscopy the previous September. Tr. 600. He noted that she was

---

[1] O'Neil only challenges the ALJ's decision with respect to her gastrointestinal impairments. Thus, only the medical evidence related to those impairments is summarized and discussed herein.

2

still taking prednisone, omeprazole and Carafate Suspension and stated, "I do not know if she is taking her medications correctly." Tr. 600. Dr. Harris instructed O'Neil to follow up in two months and adjusted her medications, including reducing, rather than discontinuing, her Pentasa. Tr. 600.

In December 2015, O'Neil visited the Cleveland Clinic to establish care for her gastrointestinal issues. Tr. 318, 315. She complained of abnormal stools, reporting that she had had blood and mucus in her stools for three weeks. Tr. 315. She stated that she had been diagnosed with Crohn's disease when she was 16 years old and indicated that she previously saw Dr. Harris. Tr. 315, 316. She was currently taking Pentasa and Imodium. Tr. 316. She reported generalized abdominal pain that can localize to the lower right quadrant, and which, that day, was 6/10 on a pain scale. Tr. 316. She complained of frequent loose stools, 6-10 times a day. Tr. 316. She was unsure of the date of her last colonoscopy and believed it was in 2009. Tr. 316. She also complained of nausea and GERD and was scheduled for an EGD Bravo (an acid reflux test) and a fundoplication (a common surgical procedure to treat GERD). Tr. 316. Her exam findings were normal, other than abdominal diffuse tenderness and guarding, including a normal gait. Tr. 317. It was recommended that O'Neil have a full upper GI workup prior to a fundoplication. Tr. 317-318.

In April 2016, O'Neil consulted with a gastroenterologist for her GERD. Tr. 310. She was assessed with severe GERD and medical refractory gastroparesis. Tr. 310. The doctor recommended pyloroplasty, a Nissen fundoplication, and smoking cessation. Tr. 310. In June 2016, O'Neil underwent surgery to repair a hiatal hernia and to widen the opening of the lower part of her stomach (pyloroplasty). Tr. 290-293.

On October 31, 2017, O'Neil returned to Dr. Harris stating that she was no better after

3

her procedures the previous year. Tr. 995. Dr. Harris' treatment note states, "Has no medication at this point in time." Tr. 995. O'Neil reported 5-10 loose stools a day without bleeding and some lower right quadrant pain, which, Dr. Harris noted, correlated to her prior colonoscopy findings. Tr. 995. Dr. Harris stated that she will be having umbilical hernia repair in the near future. Tr. 995. All of O'Neil's exam findings were normal, including a normal gait, grossly intact sensation, and normal reflexes. Tr. 997. Dr. Harris diagnosed GERD and Crohn's disease of both the small and large intestine with rectal bleeding. Tr. 998. He continued her Pentasa, started her on prednisone (to be taken after her upcoming surgery), and stated that she may need biologics. Tr. 998.

On November 2, 2017, O'Neil underwent surgical repair of multiple umbilical hernias. Tr. 1000.

### C. Opinion Evidence

#### 1. Treating Physician

On November 7, 2017, Dr. Harris completed a form titled Crohn's & Colitis Residual Functional Capacity. Tr. 1020. He stated that he had treated O'Neil since 2004. Tr. 1020. He listed her diagnoses, Crohn's disease and GERD, and stated that her prognosis was poor. Tr. 1020. He listed her symptoms (chronic diarrhea, bloody diarrhea, abdominal pain and cramping, mucus in stool) and characterized her pain as chronic frequent severe abdominal pain. Tr. 1020. He did not list her clinical findings and objective signs or her treatment and her response, despite the form asking these questions. Dr. Harris opined that O'Neil's pain or other symptoms constantly interfered with her concentration and that she was incapable of even low stress jobs. Tr. 1021. She could not walk any city blocks, sit or stand for more than 15 minutes at a time, and could sit, stand and walk for less than 2 hours in an 8-hour workday. Tr. 1021. She would

require a job which permits shifting positions at will and ready access to a restroom. Tr. 1021. She will sometimes need to take unscheduled restroom breaks or lie down during an 8-hour workday but Dr. Harris did not state how often or for how long, despite the form asking these questions. Tr. 1022. She could never lift any weight and could never stoop or crawl. Tr. 1022. Her impairments were likely to produce "good days" and "bad days" and she would likely be absent more than four times a month. Tr. 1022. He concluded, "Patient had chronic Crohn's disease with chronic symptoms that cause many limitations to perform in a work day." Tr. 1022.

On November 24, 2017, Dr. Harris wrote a To Whom It May Concern Letter noting O'Neil was under his care for GERD and Crohn's disease and that, "At this time, she is unable to perform any work related duties at this time [sic]." Tr. 1025.

### 2. State Agency Reviewing Physicians

On November 29, 2016, state agency reviewing physician Michael Delphia, M.D., reviewed O'Neil's record and opined that she can perform medium level work; frequently crawl and climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently push and pull with her left lower extremity; and must avoid concentrated exposure to hazards such as machinery and heights. Tr. 97-99. On March 16, 2017, state agency reviewing physician Mehr Siddiqui, M.D., adopted Dr. Delphia's opinion. Tr. 111-113.

### D. Testimonial Evidence

#### 1. O'Neil's Testimony

O'Neil was represented by counsel and testified at the administrative hearing. Tr. 34-81. She testified that she lives in a house with her parents, nephew, and children, who range in age from 17 to 13. Tr. 41. She has a therapy dog that she takes care of. Tr. 42. In addition to obtaining an Associate's degree, O'Neil took online classes for about a year to obtain a teaching

certificate, but quit when she was required to physically go to the school to take classes. Tr. 43-44. She tried to go, but she panicked and left the room. Tr. 72. She liked taking classes on the computer; she could work at her own pace and take breaks because of back pain, to use the bathroom, or when she would get sad and wanted to be alone. Tr. 74.

O'Neil does not drive and does not have a driver's license because she has a fear of driving. Tr. 45. Her parents or her boyfriend drive her places. Tr. 45. She discussed her previous self-employment as a vendor, buying and reselling items, which she performed with her son, and which she stopped doing when her son became old enough to get a job elsewhere. Tr. 46-49. Prior to that she worked briefly at a clothing store in a mall but had to quit because of her anxiety (she couldn't deal with the public) and the store complained she took too many bathroom breaks. Tr. 50. At this point in the hearing, O'Neil took a bathroom break. Tr. 50-51.

O'Neil stated that she has depression and cries a lot. Tr. 54, 58-60, 66-69, 75. She cannot lift very much and has trouble lifting even a gallon of milk because she has herniated discs that "run through [her] sciatic nerve." Tr. 55. She has terrible leg and back pain and has to switch positions a lot while she is seated. Tr. 55. Sometimes she stands up. Tr. 55. She has done physical therapy for this problem, has taken medication, and had an epidural block. Tr. 55. She is scheduled to have a second block within a week or two. Tr. 55. Regarding physical therapy, the last time she did it was two months ago, but she did not finish it because it was too hard on her back. Tr. 56. They are looking into aqua therapy. Tr. 56. She did start and complete physical therapy one year ago. Tr. 56.

Regarding her Crohn's disease, O'Neil stated that she gets bad pain on the right side of her stomach and it stays there all day. Tr. 56. She has to run to the bathroom constantly. Tr. 56. She always has diarrhea and has not had a solid stool since she was 16 years old. Tr. 56. She is

on medication for it but it does not seem to work. Tr. 56. She and her doctor have talked about putting her on "either an IV injection, IV medication, or this new injection you stick in your stomach." Tr. 56. She currently has to use the bathroom ten times a day or more. Tr. 56. Some days more, some days less, but "a good five to ten times a day." Tr. 57. Sometimes her anti-diarrhea medication, Lomotil, works, but if she takes it she is constipated for days. Tr. 57. She has bloating in her belly, which is painful. Tr. 57. After she eats, her belly bloats up and she looks like she is six months pregnant. Tr. 57. "I have Crohn's and I have gastro problems." Tr. 57. In about two weeks, she will have a colonoscopy and an endoscopy to see what is going on and then they will talk about a medication change. Tr. 58.

Regarding activities, O'Neil stated that sometimes she plays games with her children. Tr. 61. She does not shop because of anxiety. Tr. 61. Her mother and boyfriend go shopping for her. Tr. 61. Her mother cooks, although, once in a while, when she feels up to it, O'Neil cooks. Tr. 62. Her kids do the laundry. Tr. 62. She washes dishes but she can only stand and handle it for so long so she takes breaks. Tr. 62. She also cleans the kitchen, it just takes her awhile to do it. Tr. 62. Her mother will not allow her to vacuum. Tr. 65. She interacts with friends online. Tr. 63. On a typical day, she wakes up hurting because her back is stiff. Tr. 64. The first thing she does is go to the bathroom. Tr. 64. Then she makes a cup of coffee and maybe breakfast. Tr. 64. It takes her awhile to walk to the kitchen; "I should probably be using a cane, but I haven't gotten one so far." Tr. 64. She believes she should use a cane due to her sciatic nerve that goes down her leg. Tr. 64. She has to hold on to things sometimes as she walks. Tr. 64. Afterwards, she goes to her room and cries. Tr. 65. When she recovers, she comes out of her room and sits with her parents and nephew and talks to them. Tr. 65. She sits, stands, or lies down when she does this because of her back and the pain in her side from the Crohn's. Tr. 65.

She watches movies at home. Tr. 71. She does not sit though an entire movie but switches positions: she sits, lies down, or stands, "depending on how my joints and stuff feel at the time." Tr. 71. She is sometimes able to follow what is going on in the movie, depending on whether her ADHD medication is working that day or not. Tr. 72.

O'Neil estimated that she could sit for about 15 or 20 minutes before needing to get up. Tr. 75. Walking is harder than standing because her sciatic pain goes down her leg. Tr. 76. The pain is in her buttock area and goes all the way down to her toes and makes it hard for her to walk. Tr. 80. Her sciatic pain comes and goes and is bad at least 16 or 17 days a month. Tr. 76. Her lower back pain is always present and most days is an 8-9/10 with medication, 10 being unbearable, excruciating, take-yourself-to-the-emergency-room pain. Tr. 76. She had recently had hernia surgery, and when asked whether she had recovered from her surgery, O'Neil stated that she is still a little sore and that one of her "cuts" is red and looks like its infected and she thinks she should have it looked at. Tr. 77. When asked how long she was having hernia pain prior to her surgery, O'Neil answered that she was having stomach pain for six or seven months. Tr. 77. She felt a bump, went to the doctor, and the doctor told her it was a hernia. Tr. 77. The doctor thought it was one hernia but it was six. Tr. 77. When asked if her pain has been reduced since her surgery, O'Neil stated she is not having pain around her navel anymore like she was, but she is still having the right-sided stomach pain that is related to her gastroparesis and her Crohn's. Tr. 78. She is not on any pain medication for that. Tr. 78.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 81-87. The ALJ asked the VE to determine whether a hypothetical individual of O'Neil's age, education and work experience could perform O'Neil's past work or any other work if that person had the limitations assessed in

the ALJ's RFC determination, and the VE answered that such an individual could not perform O'Neil's past work but could perform the following jobs with significant numbers in the national economy: store laborer, washer, and hand packager. Tr. 83-84.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her May 17, 2018, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since September 23, 2016, the application date. Tr. 15.

2. The claimant has the following severe impairments: lumbar degenerative disc disease; gastroesophageal reflux disease (GERD); Crohn's disease; depressive disorder, anxiety disorder, and attention deficit hyperactivity disorder (ADHD). Tr. 15.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 17.

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except she can frequently crawl and climb ramps and stairs, but she can only occasionally climb ladders, ropes, or scaffolds. Additionally, the claimant can frequently push and pull with her left lower extremity, but she must avoid concentrated exposure to workplace hazards. She is also limited to performing simple, routine tasks, but not at a production rate pace. Furthermore, she can only occasionally interact with supervisors and coworkers and she cannot interact with the public. Finally, she can adapt to only occasional and routine workplace changes. Tr. 18.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5. The claimant has no past relevant work. Tr. 24.

6. The claimant was born in 1981 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 24.

7. The claimant has at least a high school education and is able to communicate in English. Tr. 24.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 25.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 25.

10. The claimant has not been under a disability, as defined in the Social Security Act, since September 23, 2016, the date the application was filed. Tr. 26.

## V. Plaintiff's Arguments

O'Neil argues that the ALJ's assessment of Dr. Harris' opinion is not supported by substantial evidence. Doc. 12, p. 7.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

O'Neil argues that the ALJ failed to provide good reasons for discounting the opinion of Dr. Harris, her treating gastroenterologist. Doc. 12, p. 8. After discussing other opinion evidence (including explaining why she gave "great" weight to the state agency reviewing physicians), the ALJ wrote:

> I also give little weight to the opinion of Craig Harris, M.D. Dr. Harris is the claimant's treating gastroenterologist. He submitted a statement that the claimant can only stand, walk, and sit for less than two hours each in an eight-hour workday and she can never lift any weight or perform any postural activities. He also stated that she would require extra unscheduled rest breaks, she would have constant interference with her concentration, she would be expected absent four or more times per month, and she would be incapable of even low stress jobs (Ex. 31F, pp 2-4). Dr. Harris also submitted another statement indicating that the claimant is unable to perform any work related duties (Exs. 32F, p. 1). Dr. Harris's statements about the claimant's inability to perform any work address[es] an issue that is explicitly reserved to the Commissioner under the rules and regulations of the Social Security Administration. Additionally, Dr. Harris's other opinions are grossly inconsistent

> with his own examination findings, as well as the examination findings of Drs.
> Kabbara and Yonan, which show no evidence of gait disturbance or motor or
> sensory loss (Exs. 16F and 24F). Thus, I give little weight to the opinion of Dr.
> Harris.

Tr. 24.

O'Neil concedes that the ALJ's explanation regarding Dr. Harris' opinion that O'Neil could not perform any work duties was sufficient. Doc. 12, p. 9, n. 3. But regarding the ALJ's explanation for discounting Dr. Harris' opinion regarding O'Neil's functional limitations, O'Neil argues that the ALJ's reference to "gait disturbance or motor or sensory loss to discount an opinion regarding the impact of Crohn's disease makes little sense." Doc. 12, p. 9. She points out that Dr. Harris did not identify gait and sensory deficits as the basis of his opinion "and it is unclear under what circumstances a gastroenterologist would examine a patient's gait." Doc. 12, p. 9.

The Court notes that Dr. Harris did, in fact, assess O'Neil's gait at her most recent visit and listed her gait as "normal"[3] (Tr. 997), as did another gastrointestinal consultant (Tr. 317). Thus, it is, apparently common for a gastroenterologist to assess a patient's gait. Moreover, O'Neil's assertion that the assessment of a patient's gait is unrelated to gastrointestinal problems undercuts Dr. Harris' opinion and bolsters the ALJ's assessment of the opinion. For, if, as O'Neil suggests, the ability to walk is unrelated to gastrointestinal matters, why should Dr. Harris have limited O'Neil's ability to walk at all, let alone state that she could not even walk one city block? It was accurate for the ALJ to find that Dr. Harris' opinions were inconsistent with his own exam findings and proper for the ALJ to consider any other evidence of record related to O'Neil's ability to walk, sit, stand, or lift. Even O'Neil did not state that she was unable to walk

---

[3] Dr. Harris' earlier treatment notes do not contain objective examination findings other than O'Neil's abdomen.

or lift due to her gastrointestinal issues. Rather, O'Neil testified that she cannot lift due to back pain and that walking is difficulty due to her sciatica. Tr. 76, 80.[4]

In her reply brief, O'Neil argues, "the ALJ never identified any actual[] inconsistency between Dr. Harris's opinion and his records." Doc. 17, p. 1. But elsewhere in her decision, the ALJ remarked that, during visits with Dr. Harris, O'Neil was found to have minimal abdominal tenderness and no masses or bleeding. Tr. 20, 21. O'Neil does not cite any treatment note showing that Dr. Harris observed her to have severe abdominal pain, problems with her gait, or any other findings that would support the strict limitations that Dr. Harris assessed. And, as noted, Dr. Harris himself did not provide an explanation in his opinion.

Finally, as the ALJ observed elsewhere in her decision, O'Neil was routinely found to have minimal abdominal pain and largely normal abdominal findings upon exam. Tr. 20, 21. O'Neil does not challenge these findings. Nor does she challenge the ALJ's long explanation and resultant determination that O'Neil's limitations are not as severe as she alleged. Tr. 22. And she does not challenge the ALJ's recitation of the record evidence regarding O'Neil's back pain and treatment or the ALJ's reliance upon the state agency reviewing physicians' opinions. Tr. 19-20, 23. The ALJ's assessment of Dr. Harris' opinion is supported by substantial evidence and, therefore, the ALJ's decision is affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

---

[4] Additionally, in her opening statements at the hearing, counsel for plaintiff argued that O'Neil was unable to perform even sedentary work "from a physical exertional standpoint related to her back problems." Tr. 37.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

IT IS SO ORDERED.

Dated: March 31, 2020

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge